# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT L. STICKNEY, ) <br><br> Plaintiff, ) <br><br> vs. ) <br><br> ROBERT LIST et al., ) <br><br> Defendants. ) | 3:79-cv-00011-RCJ <br><br> **ORDER** |

This case arises out of inadequate staffing at Northern Nevada Correctional Center ("NNCC"). Pending before the Court is a motion to terminate the permanent injunction. In 1979, Plaintiff Robert Stickney filed this action, arguing that various conditions at NNCC violated the Eighth Amendment. Judge Reed certified the case as a class action in 1981 and entered judgment in 1982 after a bench trial. (*See* Mem. Dec. & J. 1–4, May 14, 1982, ECF No. 175-1, at 5). Plaintiff argued, *inter alia*, that overcrowding at NNCC had resulted in frequent assaults and other unconstitutional conditions. (*Id.* 6). Judge Reed found that violence in Units 1, 2, and 3 at NNCC "exceed[ed] constitutional standards" and was due "essentially to understaffing," (*id.* 7),[1] ordering the following injunctive relief:

---

1 Judge Reed ruled that Plaintiff's claim that prison staff was inadequately trained was not cognizable. (*Id.* 10). Nor was his complaint about a lack of job opportunities. (*Id.* 18). He found that evidence of isolated incidents of assaults on psychiatric patients by inmate psychiatric

[No fewer] than two correctional officers [shall] be on duty at all times in Units 1, 2 and 3 at NNCC. In the event that the number of inmates housed in any of Units 1, 2 and 3 shall exceed 172, . . . a minimum of three correctional officers must be assigned to duty on a 24-hour basis in such unit. If all three of said units exceed an inmate population of 172, then said minimum staffing must also include an additional two roving officers who may move about said three units . . . .

(*Id.* 19). Judge Reed later clarified that the units could exceed 172 while inmates were briefly shuffled during a prison refurbishing project, and that the injunction would not be violated if correctional officers had to leave the subject units to respond to emergencies elsewhere in the prison or to escort inmates to the cafeteria. (Order, Oct. 19, 1982, ECF No. 175-1, at 2).

Defendants have asked the Court to terminate the injunction under the Prison Litigation Reform Act of 1996 ("PLRA"). In a "prison conditions" case where prospective relief was ordered before the date of enactment of the PLRA, as here, any party may request termination of such relief two years after the date of enactment. 18 U.S.C. § 3626(b)(1)(iii). Defendants are:

entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

*Id.* § 3626(b)(2). However,

Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

*Id.* § 3626(b)(3).

─────────────────────

attendants was insufficient to show deliberate indifference, (*id.*), as was evidence of isolated incidents of inoperable firefighting equipment, (*id.* 11). He found that the nutritional value of the food at NNCC was constitutionally sufficient, (*id.* 12), as were the conditions of cells, (*id.* 13–14), medical care, (*id.* 14–15), sanitation (*id.* 15–16), clothing and laundry, (*id.* 16–17), bedding, (*id.* 17), health and hygiene items, (*id.*), heating, (*id.*), water supply, (*id.* 17–18), recreational opportunities, (*id.* 18), and prison maintenance, (*id.*).

The Court cannot, of course, re-litigate the underlying constitutional question, and Defendants do not alternatively ask the Court to relieve it from judgment under Rule 60(b)(6), i.e., due to changed conditions. A court's task under § 3626(b) is to determine first not whether the remedy previously imposed was in fact the least intrusive necessary, but whether the court issuing the injunction so found. *See id.* § 3626(b)(2). Only if the answer to that first question is "no" does a court proceed to examine whether the remedy previously imposed remains the least intrusive necessary to correct an ongoing violation. *See id.* § 3626(b)(3). The Court cannot say that Judge Reed failed to make the required findings with respect to the two-guard requirement in each of Units 1, 2, and 3. However, he did not make explicit findings with respect to the three-guard requirement when any of the units exceed 172 inmates or the two-roving-guard requirement when all three of the units exceed 172 inmates.

In 1982, Judge Reed did not have the benefit of the PLRA's text concerning the tailoring of remedies. Nevertheless, he clearly recognized that his function was to "fashion[] a remedy that does *no more* . . . than correct th[e] particular constitutional violation." (Mem. Dec. & J. 5 (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)) (emphasis added)). Although he did not use the phrase "least intrusive means," the phrase "no more" is essentially synonymous therewith. It is the substance of Judge Reed's findings, not whether he used "talismanic language," that matters, *cf. Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (Gorsuch, J., joining), especially where the language at issue was not adopted until after Judge Reed ruled.

Still, Judge Reed only made an explicit finding of narrow tailoring as to the two-guard requirement, not as to the three-guard or two-roving-guard requirements. In making his findings, Judge Reed relied on the testimony of former Director of Corrections of the State of California

Jerry Enomoto, who inspected NNCC in order to prepare an expert report as to sufficient staffing levels for guards. (Mem. Dec. & J. 3–9). Judge Reed found that "unless additional staff is provided to supervise the inmates confined in Units 1, 2 and 3, of NNCC, the inmates are not safe . . . ." (*Id.* 7). He accepted Mr. Enomoto's expert opinion that "there is only *one reasonable way* to control assaults among inmates and that way is to direct supervision of the inmates by additional *necessary* correctional officers." (*Id.* 9 (emphases added)). But Judge Reed's only finding as to what particular level of staffing was necessary to avoid a constitutional violation, based on Mr. Enomoto's expert report, was that "*at least two guards on watch during every shift in Units 1, 2 and 3 is the minimum required* to ensure a reasonable level of safety in each unit." (*Id.* (emphasis added)). No similar findings were made as to the three-guard or two-roving-guard requirement, which were simply appended to the decree, (*see id.* 19), without any findings of narrow tailoring, (*see id.* 9).

In summary, Defendants are not entitled to termination of the injunction as to the two-guard requirement. In most circuits, Defendants would be entitled to immediate termination of the three-guard and two-roving-guard requirements (unless Plaintiff showed that they were the least restrictive necessary to remedy an ongoing violation under current conditions), but in this Circuit the Court may not so rule unless the record before Judge Reed would not have supported such a finding, regardless of whether Judge Reed made explicit findings to that effect. *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 1008 (9th Cir. 2000). *Contra Benjamin v. Jacobson*, 172 F.3d 144, 158 (2nd Cir. 1999) (en banc); *Cagle v. Hutto*, 177 F.3d 253, 257 (4th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000).

Accordingly, the Court has requested and received from the National Archives a copy of Mr. Enomoto's expert report ("the Report") relied upon by Judge Reed.[2]  The Report indicates that Mr. Enomoto inspected NNCC on eight days between July 21 and 31, 1981, with the participation of Plaintiff. (Jerry Enomoto, Report of Prison Expert 1, Sept. 13, 1981, Dkt. No. 59).  Mr. Enomoto's conclusions as to inmate safety with regard to staffing read in relevant part:

> I must conclude that inadequate Correctional Officer positions at NNCC jeopardizes both inmate and staff safety.  Modern correctional standards oppose the housing of medium security inmates in dormitories because control of such areas is extremely difficult.  Analysis of the population shows that there are inmates with serious management problem histories at NNCC.
>
> The physical layout of Units 1, 2 and 3 are such that visual supervision of all three (3) wings is impossible from the custody office in the rotunda.  This is compounded by the fact that inmates are housed in twelve (12) man dormitories and five (5) bed day rooms (soon to be increased) that are crowded with property and are difficult to see into.
>
> The minimum staffing for these units should be three (3) C.O.'s so that at least two (2) are available to rove through the dormitories.  The current staffing is two (2) on the day, evening and morning shifts.  It is not uncommon for positions to be allocated elsewhere because of demands for court and hospital coverage outside the institution.  This results in only one (1) C.O. remaining to provide coverage in the unit.

(*Id.* 10).  Although Mr. Enomoto opined that there was no deliberate indifference in the constitutional sense, because NDOC had requested additional staffing but had been denied by the state legislature, (*id.*), Judge Reed did not adopt that aspect of the Report.

Mr. Enomoto addressed overpopulation in Units 1, 2, and 3 under the section of the Report concerning the complaints about adequate shelter.  He noted that "NNCC is seriously overcrowded." (*Id.* 7).  Units 1, 2, and 3 were each designed for 144 inmates, with each unit consisting of three wings extending from central rotundas. (*Id.* 7–8).  The capacities of Units 1,

---

2 Because it is not in the electronic record, the Court will append the Report to this Order.

2, and 3 had been expanded to 194, 194, and 199, respectively, by using day rooms for housing, and the actual populations of the units were 186, 166, and 186, respectively. (*Id.*). The Report does not indicate a 172-inmate threshold for additional guards. The Court notes that 173 is the point at which the units exceed 120% of their design capacity. However, the Report does not ascribe any significance to that figure. Moreover, Mr. Enomoto concluded that "Although NNCC is seriously overcrowded, I do not believe that the effects of that condition have created constitutional violations." (*Id.* 12). In other words, the record does not support a finding that overcrowding had led to any constitutional violations. The record only supports a finding of violations based on inadequate staffing, regardless of whether Units 1, 2, and 3 were above or below design capacity. It is the physical layout of Units 1, 2, and 3 (each of which consists of three wings emanating from a central rotunda) that requires minimum staffing levels in order to avoid a constitutional violation, not overcrowding. (*Id.* 10, 12).

Mr. Enomoto's expert recommendations as to minimum staffing were in one way stricter but in another way more lenient than the remedy Judge Reed imposed:

> The minimum staffing for these units should be three (3) C.O.'s so that at least two (2) are available to rove through the dormitories. The current staffing is two (2) on the day, evening and morning shifts. It is not uncommon for positions to be allocated elsewhere because of demands for court and hospital coverage outside the institution. This results in only one (1) C.O. remaining to provide coverage in the unit.

(*Id.* 10). In one way, the Report recommended a stricter remedy, i.e., three guards per unit at all times. (*See id.*). Judge Reed required two guards per unit at all times (which was already in place, according to the Report), and three guards per unit at all times only when a unit exceeded 120% of design capacity. The Court therefore cannot say that the record does not support the requirement of three guards per unit when any unit exceeds 172 inmates, *Gilmore*, 220 F.3d at 1008, because it would in fact have supported a requirement of three guards per unit at all times

regardless of inmate population. In another way, however, Judge Reed imposed a remedy stricter than that supported by the record. The Report indicates that three guards per unit is advisable so that two may rove the wings of the unit while one guard remains in the central rotunda. But the Report includes no recommendation for any number of additional guards to rove between the units themselves.[3] The record simply does not support this aspect of the injunction, and Defendants are entitled to its immediate termination unless Plaintiff can show that the remedy is the least intrusive necessary to correct an ongoing constitutional violation. *See* 18 U.S.C. § 3626(b)(3). Plaintiff cannot make a showing of an ongoing violation in this case, because the record did not support a finding of a violation even in 1982. That is, any finding of a constitutional violation, the least intrusive remedy for which is two additional roving guards, would have to be based on a *new* violation asserted via a new claim; it cannot be based on an *ongoing* violation in this case, because not only did Judge Reed not make explicit findings that the two-roving-guard requirement was the least intrusive remedy necessary to correct a constitutional violation, the record would not have supported such a finding.

Finally, the Court notes that Defendants claim the conditions leading to the injunction no longer exist. Defendants remain free to file a motion under Rule 60(b)(6). The Court cannot reexamine the underlying constitutional issues in the absence of such a motion. The Court's power to terminate the injunction under the present PLRA motion are more limited.

---

3 The Court respectfully believes that Judge Reed may have misinterpreted the Report to include a recommendation of additional roving guards, based on the recommendation of three guards per unit "so that at least two (2) are available to rove through the dormitories." But the only recommendation in the Report as to roving guards is an increase in guards from two per unit to three per unit so that in each unit two guards may rove *between the three wings of a single unit* while one guard remains in the central rotunda of that unit, not that any additional roving guards are required to rove *between units*.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Terminate Prospective Relief (ECF No. 175) is GRANTED IN PART and DENIED IN PART. The requirements of two guards per unit at all times in Units 1, 2, and 3 at Northern Nevada Correctional Center and three guards per unit when the inmate population of the unit exceeds 172 shall remain in force. The requirement of two additional roving guards when all three units exceed 172 inmates is terminated.

IT IS FURTHER ORDERED that the Motion for Postponement of Automatic Stay (ECF No. 178) is DENIED.

IT IS SO ORDERED.

Dated this 16th day of April, 2018.

_____
ROBERT C. JONES
United States District Judge

CONDITIONS OF CONFINEMENT

AT THE NORTHERN NEVADA CORRECTIONAL CENTER

STEWART, NEVADA

FILED

JAN 1 1 1982

CLERK, U. S. DISTRICT COURT
DISTRICT OF NEVADA

BY _____ DEPUTY.

REPORT OF PRISON EXPERT

JERRY ENOMOTO

COURT APPOINTED EXPERT

SEPTEMBER 1981

59

# TABLE OF CONTENTS

PAGE

COVER LETTER OF EXPERT ................................ v

I. INTROUCTION ................................... 1

II. AREAS SPECIFIED FOR INSPECTION ................. 1

    A. INMATE SAFETY ............................ 1

        1. Incident Reports .................... 1

        2. Staffing Pattern ................... 2

        3. Roster Sheets ...................... 2

        4. Training Program ................... 2

        5. Fire Hoses ......................... 2

        6. Classification ..................... 3

        7. Guard Towers ....................... 3

        8. Abuse of Patients .................. 3

    B. FOOD ..................................... 3

        1. Areas Inspected .................... 3

        2. Cleanliness ........................ 3

        3. Equipment Breakdowns ............... 4

        4. Feeding Problem .................... 5

        5. Lack of Heat ....................... 5

        6. Understaffing ...................... 5

    C. MEDICAL SERVICES ......................... 5

        1. Infirmary .......................... 5

        2. Understaffing ...................... 5

        3. Inmate Attendants .................. 6

4.   Minor Surgery  ........................  6

5.   Legislative Bill 421  ...............  6

6.   Complaints  .........................  6

7.   Budget  .............................  6

8.   Dispensing Medication  ..............  7

9.   Plasma Center  ......................  7

10.  Delays in Hiring Staff  .............  7

11.  Dental Services  ....................  7

D.   SHELTER  ................................  7

1.   Overcrowding  .......................  7

2.   Population Projections  .............  8

E.   SANITATION  .............................  9

1.   Poor Maintenance  ...................  9

2.   Shortage of Supplies  ...............  9

3.   Understaffing  ......................  9

4.   Deterioration of Equipment  ........  9

F.   CLOTHING  ...............................  9

1.   Shortage  ...........................  9

2.   Exchange Process  ...................  9

3.   Boiler Room Problem  ................  9

4.   Zero Inventory  .....................  9

III.  CONCLUSIONS  ...............................  10

A.   INMATE SAFETY  ..........................  10

1.   Staffing  ...........................  10

2.   Training  ...........................  10

B.   FOOD  ...................................  11

1. Serious Problems ................... 11

    a) Staffing ...................... 11

    b) Equipment ..................... 11

    c) Feeding ....................... 11

2. Lack of Funds .................... 11

C. MEDICAL CARE ......................... 12

1. Problems ......................... 12

    a) Staffing & Inmate Attendants .. 12

D. SHELTER .............................. 12

1. Overcrowding ..................... 12

    a) General Population Units ....... 12

    b) Units 4 and 5 ................. 12

    c) Program Space ................. 13

2. Public Work's Board .............. 13

3. Population Increases ............. 13

E. SANITATION .......................... 13

1. Constitutional Dimension ......... 13

    a) Staffing ...................... 13

    b) Material & Supplies .......... 13

    c) Poor Maintenance ............. 13

    d) Replacement Boiler ........... 13

F. CLOTHING ............................ 13

1. Constitutional Obligation ........ 13

2. Underfunding ..................... 13

IV. OTHER OBSERVATIONS ........................ 14

A. PRISON ATMOSPHERE ...................... 14

B. PROGRAMS .............................. 14

C. PRISON INDUSTRIES ....................... 14

D. VOCATIONAL INDUSTRIES ................... 14

E. ACADEMIC EDUCATION ...................... 14

F. VISITING .............................. 14

G. CAMP .................................. 14

H. LACK OF FUNDS ......................... 15

V. APPENDICES ................................ 16

Appendix A — Acitivity Reports ............... 17

Appendix B — Dop Long-Range Population
projections by the Office of Assistant
director ..................................... 27

Appendix C — Hot & Cold Food Carts
Memorandum to John Slansky, Superintendent
Drawing of Modifications ..................... 31

CERTIFICATE OF SERVICE BY MAIL ..................... 34

# REPORT OF COURT APPOINTED EXPERT

TO:  Mr. ERNEST ADLER, Deputy Attorney General,
     Capitol Complex, Carson City, Nevada 89710 and
     Mr. ROBERT STICKNEY, Classs Representative, Post
     Office Box 607, Carson City, Nevada 89701.


This report is submitted in compliance with the Order of
the Honorable EDWARD C. REED, JR., United States District
Judge, which directs me to study the conditions of the
Northern Nevada Correctional Center.

I have attempted, in this report, to present my findings
briefly and concisely.  A great deal of data was gathered
in the course of the study.  The data which bear directly
upon my findings in this report are included.  All other
supporting documents, including three drawings, are on file
with the expert and available to the Court and counsel.

The report is transmitted to the Court and counsel for
their consideration and appropriate action.


                        Respectfully submitted,


                        JERRY ENOMOTO
                        6917 Greehaven Drive
                        Sacramento, California 95831



September ─1─3──── , 1981

# I.  INTRODUCTION

Pursuant to the order of the United States District Court
dated July 27, 1981, I inspected the Northern Nevada
Correctional Center on the following dates:  July 21, 1981;
July 23 and 24, 1981; July 27, 28, 29, 30 and 31, 1981.

Activity reports covering these inspections are attached
hereto and incorporated herein by reference as Appendix A
to this report.

These inspections were carried out with the direct
participation of Mr. Robert Stickney and a representative
of the Northern Nevada Correctional Center who acted as the
designee of Deputy Attorney General Ernest Adler.  A few
interviews were conducted by me, when one of the others was
called away.  This, however, was rare.

The methodology employed was a combination of interviews
with staff and inmates (mostly at their job sites), review
of institution and department documents and direct
inspection of physical facilities.

The inspection was done with emphasis upon the areas of
Prisoner Safety, Food, Medical Services, Shelter,
Sanitation and Clothing specified in the Court order.  It
also considered the Court's instructions that the
inspection need not be limited to those specific areas.

I am mindful of the court's instructions regarding the
rejection of the "Totality of Circumstances" doctrine and
the need to determine whether the Northern Nevada
Correctional Center was meeting its Eighth Amendment
obligation to provide the necessities in question.

In the following section I will present my observations of
the conditions at the Northern Nevada Correctional Center
in the specified areas.  I will include reference to areas
other than those specified, in order to present the issues
more clearly.


## II.  AREAS SPECIFIED FOR INSPECTION BY THE COURT

A.  Inmate Safety
    ------------

        1.  An analysis was made of Significant Incidents
of Violence directed toward inmates by other inmates from
January 1979 through June 1981.  (The suit was filed in
January 1979).  Source documents were monthly reports by
Superintendent Slansky to the Director, which include all
significant incidents, cross checked with the incident
report file.

No significant pattern of violence was evident. During roughly the last nine (9) months of 1980 there were a greater than usual number of assaults (perhaps six), some involving night attacks on inmates by masked intruders.

In a prison where medium custody inmates are housed in dormitories in an overcrowded situation, with inadequate staffing, the number of serious assaults is surprisingly low.

2. Analysis of the Staffing Pattern indicates that more Correctional Officer (C.O.) positions are needed for general population Units 1, 2 and 3. These Units are assigned two (2) C.O. positions but frequently function with one, because an officer is assigned elsewhere, often to cover inmate transportation to court, outside hospital, etc. for which NNCC is not budgeted.

The design of Units 1, 2 and 3 makes direct visual supervision of the three housing wings impossible without roving positions. The housing of medium custody inmates in dormitories is undesirable and, when compounded by housing men in dayrooms, with inadequate C.O. coverage, a potentially dangerous situation exists.

A minimum of three (3) C.O. positions on each watch, as requested by the Superintendent, is necessary from an inmate safety standpoint. Reliance upon the lack of past major incidents is an unacceptable gamble with inmate lives.

I was informed by Assistant Director Perry Comeaux that early recruitment of approved positions for Southern Desert Correctional Center (SDCC), if approved, could provide these positions until SDCC is activated.

3. Roster Sheets were randomly reviewed to verify the number of custodial staff who actually reported on shifts during given dates.

4. The Training Program has a direct bearing upon inmate safety because poorly trained staff can jeopardize lives. The nine (9) week program for new C.O.'s is a good one. However, there are no funds for ongoing In-Service Training, nor for Supervisory Training, nor is there a Training Officer position at NNCC.

The combination of an overcrowded institution, insufficient C.O. positions and an inadequate training program creates a potential hazard.

5. Mr. Stickney, Captain Ewing and I, on a visit to three (3) successive Units, found the fire hoses inoperative. We also could not get into the fire box because a master key to open all boxes had been fashioned

and staff were not aware of it.

The fire hose in the culinary was operative.

Immediate steps were taken to correct the fire hose problem and to color code the fire box key. Fire extinguishers were spot checked and found properly maintained. Adherence to Department of Prisons Procedure #226 sections 7b and 10a would have prevented the situations we witnessed. This experience underscores the need for better communications, training and regular inspections.

      6. Classification is relevant to prisoner safety and appears to be functioning adequately. A weekly initial classification is chaired by the Director and each Superintendent and key staff participate. "Yard Classification" is held twice weekly. A spot check of inmate files was made and showed that inmates are seen quite often — no less then once every ninety (90) days.

Also, an inmate claiming a need for protection is placed in protective custody so as not to risk endangering lives.

There is a feeling that inmates who should be locked up are in the general population. However, it is an axiom in the prison business that risks need to be taken sometimes and without solid justification you cannot keep inmates locked up indefinitely.

      7. The combinations of the four (4) armed towers and the perimeter patrol vehicle provide good perimeter security. Tower three (3) has the best visual observation of Units 4 and 5. The others have very limited vision so gun coverage of the "yard" is very poor.

      8. Complaint of Inmate Psychiatric Attendant (IPA) abuse of patients — will be addressed under "Medical Care".

B. Food
  ----

      1. The kitchen, dining hall, scullery, storage and baking areas were inspected. The food services procedure, budget requests, management memos, documentation of past visits and inspections by a dietician, and memus over a period of time were reviewed.

The Departmental Food Administrator, NNCC Food Manager, Culinary Sergeant, Watch Commander and a former Culinary Sergeant, and two (2) former inmate first cooks were interviewed. Various inmates' opinions of the food were obtained.

Several meals were eaten and feeding lines observed. Mr.

Stickney and I observed the evening meal for Unit 5 loaded
on two (2) carts, followed the carts to Unit 5 and observed
the entire feeding process.

We also ate two (2) meals at the Honor Camp dining room.
The food eaten in both dining rooms was tasty and, from my
layman's view, appeared to be balanced and nutrictious.
The menus seem carefully planned and reflect balance.
However, when circumstances require changes, there are
complaints about lack of variety.

It should be noted that the Department has received some
assistance by a dietician from the Health Department who
did make a number of trips to the prisons as an advisor.
This resource has been eliminated with the loss of that
position during the past legislative session.

        2.  Cleanliness was marginal in all areas, with
plenty of room for improvement.  During lunch one day, it
was necessary for the Superintendent to instruct the Dining
Room Officer to have the tables cleaned.

Due to the small size of the aperture through which inmates
deposit dirty trays and utensils, the buildup falls into
the dining room side when the volume is heavy.

I noticed work orders, calling for improvements cited by
the Department of Health in 1979, that were never completed
due to lack of funds.

All inmate workers on the feeding line, although dressed in
whites, did not have adequate headwear - and there was room
for improvement in appearance.

At least one (1) cart used to carry food to Units 4 and 5
is not lined with stainless steel, so food is transported
in a cart with porous wood sides and bottom.

Cleaning supplies are not adequate and the purchase process
is cumbersome and makes timely replacement extremely
difficult.

        3.  Equipment breakdowns cause greater than
necessary problems due to the lack of replacement parts and
the time needed to obtain them.  It has taken months to
repair problems in refrigeration units, equipment in the
tray room, bake shop, etc.

The poor ventilation system in the tray room causes
sanitation problems which have been called repeatedly to
the Department's attention by health inspectors.

Such needs as a new roof, replacement of broken windows,
etc., remain unmet due to lack of funds.

There is little preventive maintenance practiced.

  4. There is a major problem in the feeding of Units 4 and 5. The process of food delivery from the kitchen, and its ultimate serving to the inmates, often results in hot food becoming cold and cold food warm.

The lack of personnel to supervise the process is a problem.

  5. Another major problem is the lack of heat in the dining room, which is a direct result of breakdowns in the boiler room.

  6. There are not enough staff to cover a culinary operation that now feeds about 940 inmates, and will be expected to feed more. Current staffing patterns provide two (2) Cooks, Food Manager, Sergeant and two (2) C.O.'s. The hours of coverage are as follows:

```
Supervising Cook   5 am to  1 pm   C.O.  5 am to   1 pm
Supervising Cook  10 am to  6 pm   C.O.  2 pm to  10 pm
Food Manager       8 am to  4 pm   Sgt.  7 am to   3 pm
```

The lack of relief means that there are more than two (2) months during the year when vacations result in no cook being available at certain times, leaving a C.O. or Sergeant in complete charge of the Culinary. The lack of sufficient positions causes: a) problems in the preparation of food, b) excessive pilferage, and c) inability to maintain cleanliness, due to lack of supervision.


C. Medical Services
   ---------------

  1. The sixteen (16) bed Infirmary reportedly has an average occupancy rate of five (5) or six (6) per day. Cleanliness was marginal, with plenty of room for improvement.

  2. Everyone interviewed commented on understaffing. Two (2) licensed Practical Nurses (LPN) positions were lost in the last legislative session.

The staffing pattern is: Departmental Medical Director (who functions as the chief medical officer of NNCC), a physician, two (2) Registered Nurses (RN), three (3) LPN's, an Associate Records Technician, a C.O. on the day and evening shifts and a consultant Radiologist. There is no medical coverage on the morning shift. The RN's work overlapping hours on the day shift and the LPN's do the same on the evening shift. A physician is on call at all times.

3.  A major problem is the use of Inmate
Psychiatric Attendants (IPA).  Staff and inmates expressed
varying degrees of concern in this area.

IPA's are utilized in the psychiatric wings in both Units 4
and 5.  There have been many complaints, difficult to
verify, about IPA abuse of patients, i.e. pressuring for
sexual favors, extorting store items, etc.  The record
indicates that some IPA's have been removed from their
assignments.

Clinical services in Unit 4 are provided by a Clinical
Psychologist (Dr. Vogt) and a Counselor (Ms Rita Pitts).
Dr. Freemam, whose office is in Unit 5, and the Counselor
(Mr. Glen Whorton) compose the clinical staff in Unit 5.

It is estimated that the approved new Psychiatric Unit
should be on line within a year to eighteen months time
frame.  At that time, an additional thirty (30) beds will
be available.  Proposed staffing for that Unit includes
psychiatric nurses.

        4.  Nothing but minor surgery is done at the
Infirmary.  Other surgery is done at the Carson-Tahoe
Hospital.  There is no problem with this, although it is an
expensive budget item.

        5.  The last legislature passed a bill requiring
each inmate requesting medical services to pay three
($3.00) dollars per visit.  Services mandated by the prison
are excepted and it appears that inmates without funds are
not refused care.  In the first month of experience, it
appears that sick calls have dropped about fifty (50%) per
cent.  The staff also report that the fees are being
collected without significant difficulty.  The fee is also
built into the Department's budget as income.

        6.  There are inmate complaints about
unresponsiveness and quality of care.  Many complaints
center upon the physician, Dr. Ralston.  My impression is
that the problem is more with reactions to personal style,
rather than medical competence, which I am not qualified to
judge.  The Medical Director, Dr. Freeman, holds that view.

The sick call process is the object of complaints.
Although "kites" (written requests for care) are required,
no pain, bleeding, disturbance, etc. is ignored and are, in
fact, treated as emergencies which are seen immediately.

There are the expected "horror stories" about medical
incompetence, but no valid facts are available.

        7.  Dr. Freeman indicates that the medical budget
was increased about fifteen (15%) per cent, which means

about seven-hundred ($700.00) dollars is available per
year, per inmate. Although still inadequate, he feels
there has been gradual improvements in services over the
past four (4) years.

8. All medication is dispensed by licensed
staff. There are four (4) pill calls daily. Nurses make
rounds three (3) times daily to Units 4 and 5, where
inmates need care who cannot get out to visit the
Infirmary.

9. The Plasma Center, where inmates give blood,
serves as a adjunct to the Infirmary in that it provides
certain screening services that pick up illness. Dr.
Freeman claims a significant reduction, almost elimination,
of "Hepatitis B".

10. Complaints about lengthy delays in ability to
hire staff were reiterated. Presently, the problem
involves the hiring of a nurse.

11. There is one (1) dentist on the staff (Dr.
Runyan). He feels that dental services are very
inadequate. The equipment is outdated and needs
replacement. Screening and emergency work takes all of his
time. The youth of the population and neglected teeth
create a heavy emergency workload. On the day that I
talked to him, Dr. Runyan had seen twenty-three (23)
inmates at the Nevada State Prison and had about eight (8)
more to see at NNCC.


D. Shelter
   --------
1. NNCC is seriously overcrowded. On the last
day of my inspection a decision was made to accomodate more
inmates by appropriating the hobby room in each Unit for
more beds, five (5) in each.

The large room in the Culinary building used for housing
was inspected. Carefully classified inmates, older and
with responsible jobs, are housed there. There are no
significant complaints and the conditions are not that
different from those in regular housing units.

General population Unit 1 provides dormitory housing with 3
wings extending off a central rotunda. A and B wings have
four (4) twelve (12) man dormitories with three (3)
dormitory day rooms housing five (5) men. C wing has four
(4) five (5) man dormitory day rooms. The designed
capacity is one-hundred forty-four (144). This capacity
has been expanded through the use of day rooms to
one-hundred ninety-four (194). The present count is
one-hundred eighty-six (186).

General population Unit 2 also provides dormitory housing, with the three (3) wings extending off a central rotunda. D and E wings have four (4) twelve (12) man dormitories, with four (4) dormitory day rooms housing five (5) men. F wing has four (4) twelve (12) man dormitories with two (2) five (5) man dormitory day rooms. The designed capacity is one-hundred forty-four (144). This capacity has been expanded through the use of day rooms to one-hundred ninety-four (194). The present count is one-hundred sixty-six (166).

General population Unit 3 provides dormitory housing with three (3) wings also extending from the central rotunda. H and I wings have four (4) twelve (12) man dormitories with four (4) day rooms housing five (5) men each. G wing has four (4) twelve (12) man dormitories with three (3) dormitory day rooms housing five (5) men each. The designed capacity is one-hundred forty-four (144). This capacity has been expanded through the use of day rooms to one-hundred ninety-nine (199). The present count is one-hundred eighty-six (186).

Special housing Units 4 and 5 are single celled units accomodating a variety of inmates with special needs i.e. reception, protective custody, mental illness and punitive segragation. Where possible two (2) inmates occupy one (1) cell.

The mix of inmates does cause control and supervision problems.

        2.  Population projections, based entirely upon the experience of the past two (2) years when the Nevada prison intake doubled, are the basis for the DOP's planning.

Presently the SDCC is scheduled to receive inmates sometime during the first quarter of 1982. At that time, there will be relief for NNCC overcrowding. However, between now and then the overcrowding will become worse. Also, if the projections hold, overcrowding will occur again in mid 1983.

Policy decisions regarding the possible housing of more inmates in camps and restitution centers will have a strong bearing on this problem. Such housing can be brought on line quicker, while the building of another prison or addition to an existing prison, will take more time. Meanwhile the side effects of overcrowding will continue to present problems as evidenced by the Department of Prisons Long-Range Population Projections attached hereto and incorporated herein by reference as Appendix B to this report.

* * * *

E. Sanitation
----------

       There are several factors that seriously affect
sanitation at the Northern Nevada Correctional Center:

       1. Poor maintenance of the physical plant makes
it difficult to keep it clean. There has been little
preventive maintenance practiced.

       2. Shortage of supplies, and delays in
replacement, makes it difficult to maintain cleanliness.

       3. Understaffing reduces the supervision in all
areas necessary to keep things clean.

       4. Deterioration of equipment, e.g. in the
Boiler Room, creates many problems. A replacement boiler
has been needed for some time. Lack of steam and hot water
leads to shutdown of services in the laundry, culinary; and
living units which cause, among other things, sanitation
problems.

A replacement boiler has been approved but will not be
operational for another ten (10) months.

My personal inspection of showers, toilet areas, kitchen,
etc. generally revealed no filthy conditions. Cleanliness
was marginal with plenty of room for improvement.

F. Clothing
----------

       1. There is not enough state issue clothing to
clothe every inmate at NNCC. Many inmates wear their
personal clothing.

       2. Observation of clothing exchange processes
indicated a fairly smooth procedure. However, on that day
no C.O. was present to supervise the line. The laundry
supervisor was the only staff member in the area and had
too many areas to supervise.

       3. The previously mentioned Boiler Room problem
affects clothing because frequent breakdowns in the laundry
and dry cleaning plant result in a shortage of clean
clothes for inmates.

       4. The so called "zero inventory" policy,
combined with the lengthy delays involved in ordering
through state purchasing, seem counter-productive to
keeping clothes and linen in adequate supply.

* * * *

* * * *

# III. CONCLUSIONS

## A. Inmate Safety

1. Staffing - I must conclude that inadequate Correctional Officer positions at NNCC jeopardizes both inmate and staff safety. Modern correctional standards oppose the housing of medium custody inmates in dormitories because control of such areas is extremely difficult. Analysis of the population shows that there are inmates with serious managment problem histories at NNCC.

The physical layout of Units 1, 2 and 3 are such that visual supervision of all three (3) wings is impossible from the custody office in the rotunda. This is compounded by the fact that inmates are housed in twelve (12) man dormitories and five (5) bed day rooms (soon to be increased) that are crowded with property and are difficult to see into.

The minimum staffing for these units should be three (3) C.O.'s so that at least two (2) are available to rove through the dormitories. The current staffing is two (2) on the day, evening and morning shifts. It is not uncommon for positions to be allocated elsewhere because of demands for court and hospital coverage outside the institution. This results in only one (1) C.O. remaining to provide coverage in the unit.

Although the four (4) towers and perimeter vehicle patrol provide good perimeter security, there is very poor gun coverage from the towers should there be problems in the yard. At least one (1) inmate was seriously injured in the yard where blind spots provided no protection from the towers.

The State cannot meet its responsibilities to provide inmates with a safe environment unless the current staffing pattern is increased. There has been no deliberate indifference on the DOP's part since it has requested the positions which were denied by the Legislature.

If the DOP receives authorization to fill certain SDCC C.O. positions, already approved earlier for assignment to NNCC, this need can be met. In any event, since NNCC population continues to grow, unless C.O. staff is augmented, an unconstitutional condition could develop.

It should be restated that the absence of a pattern of large scale, serious assaults cannot be used as an argument against taking preventive action.

2. Training - The lack of an effective on the job training program for C.O.'s and follow up training of

supervisors, creates a further hazard to inmate safety. Although this may not be a constitutional issue, it does aggravate a potentially dangerous situation.

B. Food
----

1. On the basis of my personal inspection, sampling of meals and review of menus I do not feel that the feeding operation at NNCC violates constitutional requirements. However, I feel that serious problems exist in the following areas:

a) Staffing — The Culinary is understaffed. At least one (1) more Supervising Cook position or two (2) Grade 1 Cooks as trainees are needed to give cook coverage on every shift throughout the year.

One (1) C.O. position is needed to improve supervision so that pilferage of food is reduced, cleanliness brought up to standard and inmate transportation of food to Units 4 and 5 can be supervised.

A dietician position is needed if the prison is to assure that the nutrition needs of inmates are met, particularly with the loss of the outside agency dietician who was assisting the DOP. Also the needs of inmates for special diets cannot really be met without a dietician.

b) Equipment — Replacement of needed parts and upgrading of equipment is a maintenance problem. I have been told that the DOP did receive the requested funds in the current budget to begin a preventive maintenance program. Culinary is one of many areas suffering from lack of maintenance.

c) Feeding of Units 4 and 5 — The plan endorsed by Superintendent Slansky and Mr. Harvel to use the hot tables ordered and the carts being modified as discussed in our presence with inmate Collier (who is the author of a suit on this issue) should solve this problem of delivering hot and cold food to the inmates. This matter needs to be monitored to assure that the plan, which is attached hereto and incorporated herein by reference as Appendix C of this report, is implemented.

Another needed step is the lining with stainless steel of all carts carrying food from the Culinary to the Units. Using carts with porous wooden sides and bottoms is unacceptable.

2. Food is another area where the continued lack of funds leading to understaffing, poor food preparation and unsanitary conditions could easily develop into constitutional dimensions.

-11-

C.  Medical Care
    ------------
        1.  On the basis of my personal inspection and
interviews of staff and inmates, I do not feel that medical
care at NNCC violates constitutional requirements with one
possible exception.

        However, here too I feel that there are serious
problems.

        a)  Staffing - The Infirmary is
understaffed.  The lack of medical coverage on the morning
shift is unacceptable.  This is due to the reduction of two
(2) LPN positions by the last legislature.  At a minimum,
the two (2) positions should be restored.

        The possible exception to constitutional
violation may lie in the use of IPA's.  Sufficient
experience and staff and inmate concern exist to justify
the judgment that their use is undesirable.  Modern
correctional standards mandate that no inmate help is to be
utilized in such a way.

        I believe that many IPA's are reliable and
conscientious.  I also believe that such an assignment is
beneficial to many inmates.  However, the possibility of
patient abuse outweighs the benefits.

        Placing sick inmates in the hands of other
inmates may be an abdication of staff responsibility of
constitutional dimensions.

        The State has the responsibility of providing
more clinical staff than NNCC has.  A Chief Psychiatrist
who has many administrative duties, a Clinical Psychologist
and two (2) Counselors are not adequate to care for the
inpatient population of some thirty (30) to forty (40), to
say nothing of those in remission.

D.  Shelter
    -------
        1.  Although NNCC is seriously overcrowded, I do
not believe that the effects of that condition have created
constitutional violations.

        a)  General population housing units - The
dormitories are crowded but it must be noted that the
inmates spend considerable time out of those areas.

        b)  Special Units 4 and 5 - These inmates
are housed in single cells with a number double-celled.
However, with the exception of L wing which does not have a
yard, the inmates have access to the unit or yard.  There
are plans to provide a yard for L wing.

c) Use of program space for housing - This will increase as population rises. Although an undesirable practice, it cannot be viewed as unconstitutional.

2. The follow through on the Public Works Board's assignment of priority attention to repairing the underground heating lines is crucial to providing adequate heating to the units.

3. It can be assumed that, if continued overpopulation leads to more increases in NNCC's beds with no increase in services, the constitutional rights of inmates could be jeopardized.

E. Sanitation
   ----------
1. Although cleanliness in all areas is marginal, it cannot be judged to be of constitutional dimension.

a) Staffing - Once again, it is clear that lack of adequate staff reduces the supervision necessary to maintain good sanitation standards.

b) Material and supplies - Shortage of these items is a serious problem.

c) Poor maintenance - Lack of a preventive maintenance program increases sanitation problems.

d) Replacement of boiler - This must be done to prevent the many problems that develop when various services are shut down due to boiler breakdown. The ten (10) month delay until the boiler is operational is a real problem.

F. Clothing
   ----------
1. Although all inmates are not furnished state issue clothing, all inmates who need clothing are clothed. I believe that the State is meeting its constitutional obligation in this area.

2. Despite that judgment I note that the situation is far from satisfactory. Problems of delay in the state purchasing process and underfunding are the main reasons for the problem of adequate clothing.

•  •  •  •

•  •  •  •

•  •  •  •

## IV. OTHER OBSERVATIONS

### A. Prison Atmosphere

The feeling tone of NNCC is good. Despite the overcrowding and related problems the prison appears "cool".

### B. Programs

There appears to be a shortage of constructive activity. The "Street Rediness" program seems to be an example of a good program, utilizing prison and parole resources in a cooperative way.

### C. Prison Industries

This program is in its infancy and growing. It employs about sixty (60) inmats and produces useful products. The ability to earn money and good days is an incentive. This program has the best potential for expansion and providing constructive work for inmates.

### D. Vocational Training

This program has been gradually reduced and has apparently never gotten the budget support needed. The combination of vocational training and placement in a production situation in Prison Industries is probably a practical approach, especially in a State where funds are so limited.

### E. Academic Education

There is a basically good program available but few inmates are participating.

### F. Visiting

The visiting facility is good, but badly overcrowded.

### G. Camp

As in all systems where camps exist, this program is an example of productive activity by properly classified inmates.

## H. Lack of Funds

As in the entire DOP, the effects of underfunding is apparent at NNCC. It is a tribute to the staff, and maturity of most inmates, that the Prison has had a minimum of serious trouble. However, that cannot continue to be depended upon in the face of increasing intake and rising dissatisfaction among the inmate population.

---

APPENDICES
-----------

A. ACTIVITY REPORTS

1. Dated July 20, 1981................................17

2. Dated July 21, 1981................................18

3. Dated July 23, 1981................................19

4. Dated July 24, 1981................................20

5. Dated July 27, 1981................................30

6. Dated July 28, 1981................................31

7. Dated July 29, 1981................................32

8. Dated July 30, 1981................................33

9. Dated July 31, 1981................................34

B. DOP LONG-RANGE POPULATION PROJECTIONS

1. Summary...........................................35

2. Projections for 1982 and 1983
   Prepared by Office of Assistant Director
   Dated August 14, 1981.............................36

3. Projections for 1984 and 1985
   Prepared by Office of Assistant Director
   Dated August 14, 1981.............................37

C. HOT & COLD FOOD CARTS

1. July 23, 1981, Memorandum to John Slansky,
   Superintendent of NNCC...........................38

2. July 23, 1981, Drawing of needed
   modifications....................................39

# A P P E N D I X

( A )

ACTIVITY REPORT
CLASS ACTION

Stickney, et.al. vs. List, et.al.
Case No. CV-R-79:11, ECR

Date: July 20, 1981

I left Sacramento at 9:00 a.m. and arrived in Reno at 11:25 a.m.
in order to begin my assignment to inspect the Northern Nevada
Correctional Center (NNCC) pursuant to an order issued by Judge
Edward Reed, Jr. in connection with the named class action suit.

I conferred with Mr. Jamie Cain, Judge Reed's Clerk, and received a
draft copy of Judge Reed's order. The Judge's instructions were
that I use the draft for a guideline in begining the assignment, but
not to share it with anyone. The final order was to be available
shortly.

Is was also indicated that Mr. Robert Stickney and a representative
of the Department of Prisons (DOP) would be present during all in-
spections of the NNCC. I proceeded to the DOP office in Carson City
and reviewed the draft order thoroughly. Preliminary notes were
made regarding the areas to be covered and method of coverage.
In the absence of Superintendent Slansky, I contacted Mr. Max
Neuneker, Program Director and arranged a meeting with Mr. Stickney.

During this meeting I shared the essence of the draft order and the
Judge's instructions. The anticipated fee for the work and its com-
pletion were discussed. We felt that the goal for completion of the
work on site would be by July 31. The writing of a report, in what-
ever form required by Judge Reed, would take an additional day, or
more. The anticipated receipt of the report by the court would be
no later then August 7, 1981, if all went well (later revisal to
sometime during the week of August 10, 1981).

Plans were made to tour the NNCC on July 21, 1981, beginning at
1:30 p.m. It should be noted that I made a general tour of NNCC
with Superintendent Slansky on April 12, 1981 during the course of
an earlier assignment as National Institute of Corrections Consultant.

ACTIVITY REPORT
CLASS ACTION

Stickney, et.al. vs List, et.al.
Case No. CV-R-79:11, ECR

Date: July 21, 1981

On July 21, 1981, I spent the morning at the Central Office of
the DOP meeting with Director Wolff, Mr. Harold Harvel, Food
Administrator, Mr. Pete Demosthenes, Correctional Services Officer
and Superintendent John Slansky.

The afternoon was spent touring the facility with Superintendent
Slansky and Mr. Stickney. The areas covered are listed in Mr.
Stickney's activity report. We talked with various staff and in-
mates during this tour. The tour was concluded about 3:30 p.m.
due to the necessity of my leaving for California to meet another
commitment.

I left Carson City at 4:00 p.m. arriving in Sacramento about 7:00 p.m.

ACTIVITY REPORT
CLASS ACTION

Stickney, et.al. vs List, et.al.
Case No. CV-R-79:11, ECR

Date: July 23, 1981

On July 23, 1981, I arrived in Carson City about 9:10 a.m. and
met with Mr. Harold Harvel, who gave me certain documents per-
taining to the food service operation. We then proceeded to NNCC
where we met Mr. Stickney. I interviewed Mr. Donald Tregoe, for-
mer Inmate First Cook, Lt. Gillen, Watch Commander and former
Culinary Sergeant and Sergeant Don Good.

We then proceeded to the culinary, where a close look was taken
at the kitchen and dining hall. The noon meal was eaten and the
feeding line observed. Mr. Elmer Meechem, Food Manager and Ser-
geant Pete Jorgensen, Culinary Sergeant, were interviewed.

Mr. Stickney and I observed the preparation of the food carts and
accompanied two carts to Unit 5, where we observed the entire
feeding process.

Upon returning to the Administration Building, Mr. Stickney and
I interviewed Mr. Robert Globensky, former Inmate First Cook and
Mr. Harold Harvel.

ACTIVITY REPORT
CASE ACTION

Stickney, et.al. vs List, et.al.
Case No. CV-R-79:11, ECR

Date:  July 24, 1981

On July 24, 1981, I began the morning conferring with Superintendent
Slansky.  We then met with Mr. Stickney and took stock of where
we were.  We decided to look at the areas of clothing and sani-
tation by touring the laundry and maintenance departments and in-
terviewing staff.

We toured the laundry and dry cleaning shop and interviewed Mr.
Paul Fleming, Laundry Supervisor.  We visited the boiler plant
and talked with Mr. Charlie Ames, Inmate Boiler Room Attendant.

We then proceeded to the office of Mr. Glen Bailey, Chief of Plant
Maintenance and interviewed him.

After lunch we interviewed Mr. Tom Crow, the Supply Officer, and
reviewed some of his records.

The remainder of the day was spent reviewing monthly reports pre-
pared for the Director by Superintendent Slansky which recorded
significant violent incidents from January of 1979 through June
of 1981.  This was cross referenced with his file on incident
reports for the same period.  This was done as part of my exami-
nations of the issue of "Prisoner Safety".

A call was made to Mr. Cain and a progress report given.  He in-
dicated satisfaction with what was being done and would share the
report with Judge Reed.  The official court order had not yet been
signed.

I left Carson City about 3:50 p.m., arriving in Sacramento about
7:10 p.m.

ACTIVITY REPORT
CLASS ACTION .

Stickney, et.al. vs List, et.al.
Case No. CV-R-79:11, ECR

Date:  July 27, 1981

On July 27, 1981, I left Sacramento about 6:50 a.m. and arrived in
Carson City about 9:40 a.m.  Superintendent Slansky, Mr. Stickney
and I again took stock of where we were.

We reviewed the staff roster sheets for July 20-21, 1981 and
matched them with a diagram of the NNCC physical plant to get a
picture of where the custodial staff were deployed.  It was de-
cided that the roster sheets (as revised), the diagram updated and
a summary of DOP budget request and ultimate budget decisions would
be prepared by Superintendent Slansky as appendices to my report.
This is in connection with the issue of "Prisoner Safety".

Captain Ewing, Mr. Stickney and I toured several of the Units and
Culinary to inspect fire extinguishers and fire hoses.

Six members of the Inmate Committee were interviewed in a group.

The remainder to the day and evening were spent reviewing material
and preparing preliminary notes for a final report.

ACTIVITY REPORT
CLASS ACTION

Stickney, et.al. vs List, et.al.
Case No CV-R-79:11, ECR

Date:  July 28, 1981

On July 28, 1981, Mr. Stickney and I met with two members of the
Inmate Committee not seen the previous day.

Mr Stickney and I interviewed Dr. Freeman, Medical Director.  Super-
intendent Slansky was present part of the time.  Mr. Stickney and
I interviewed Ms. Edna Mahaffey, R.N., Ms. Mary Ann Sullivan, As-
sociate Records Technician, Ms. Louise Imus, Licensed Practical
Nurse, Ms. Reva Georgetta, Licensed Practical Nurse and Dr. Van Nuys,
Consultant Radiologist.

We visited the dental clinic and interviewed Dr. Runyan and his
inmate assistant.

We accompanied Dr. Freeman to Unit 4 and Unit 5, where we talked to
staff and inmates, with most of the time spent in Unit 5 "O" wing
talking to patients.

Mr. Stickney and I spent a couple of hours in the evening meeting
with a group of inmates from the general population, including men
with reputations as leaders in the yard.

ACTIVITY REPORT
CLASS ACTION

Stickney, et.al. vs List, et.al.
Case No. CV-R-79:11, ECR

Date:   July 29, 1981

On July 29, 1981, Mr. Stickney and I were accompanied by Mr. Glen
Whorton, Reception Unit Counselor, for a completion of the insti-
tution tour which began on July 21, 1981.

We visited the room adjacent to culinary used for inmate housing.
At the vocational shops we interviewed Mr. Mitt Yeoman, former voca-
tional supervisor and Mr. Mike Walsh, Metal Shop Instructor and
Prison Industries where Mr. Wally Pritchard, Prison Industries Super-
visor, was interviewed.

At Unit 4 we interviewed Dr. Vogt, Clinical Psychologist.

We ate lunch at the camp dining room, and toured the camp, talking
with the Sergeant and other staff and inmates.

We visited the chapel and observed the music and weight lifting
rooms.

Mr. John Riggs, Academic Teacher, was interviewed and the academic
school toured, including a visit to the law library and discussion
with an inmate assigned there.

The day concluded with a meeting with the Superintendent and an
interview with Mr. Don Helling, Counselor.

A call was made to Mr. Jamie Cain who indicated that the official
court order had been signed on July 27 and would arrange for us to
receive a copy.  He stated that the format of the report would be
left up to me and that other instructions were contained in the
court order.

ACTIVITY REPORT
CLASS ACTION

Stickney, et.al. vs List, et.al.
Case No. CV-R-79:11, ECR

Date:  July 30, 1981

On July 20, 1981, Mr. Stickney and I began by interviewing Dr.
Ralston, NNCC Physician, concerning medical services.

We interviewed Ms. Rita Pitts, Unit 4 Counselor.

Mr. Harold Harvel and inmate Collier were interviewed to clarify
a misunderstanding about the planned use of hot tables and the
conversation of food carts to correct the feeding problems in Units
4 and 5.

Inmate Robert Cress discussed the "Street Readiness" program with
us.

Mr. Bill Berning was interviewed regarding NNCC maintenance problems.

Mr. Perry Comeaux was interviewed regarding overall DOP population
projections and how NNCC will be affected,  as well as other budget
matters.  Although Mr. Stickney had agreed to this interview being
conducted by me alone, I suggested to him that he also talk to Mr.
Comeaux, who was agreeable.

Some time was devoted to reviewing notes and continuing the draft
of the report.

ACTIVITY REPORT
CLASS ACTION

Stickney, et.al. vs List, et.al.
Case No. CV-R-79:11, ECR

Date: July 31, 1981

The day started at 7:30 a.m. at the Laundry, where Mr. Stickney
and I observed the clothing exchange process and again talked with
Mr. Paul Fleming, Supervisor.

I met with Mr. Ernest Adler, Deputy Attorney General, and discussed
progress to date. I was given a copy of Judge Reed's final order,
dated July 27, 1981. The order was not significantly different from
the draft with which I have been working. Mr. Adler confirmed that
the DOP representative who was with us on any phase of the inspec-
tion was his designee, as called for in Judge Reed's order.

We interviewed Lt. Scott in Unit 5.

We visited the inmate store and were briefed on its operation.

We observed the visiting procedure and talked with the C.O.'s on
duty.

Several members of the Inmate Committee, not previously seen, were
interviewed in a group.

Inmate Robert Kelly, former Inmate Psychiatric Attendant and victim
of a stabbing assault was interviewed.

Mr. Stickney and I had a concluding discussion and it was agreed
that the goal would be for the final report to be filed with the
Court during the week of August 10. Mr. Stickney is also aware
that I will not be available during the period of August 8 through 19.

My last activity was to visit each of the four NNCC towers, observe
their fields of vision and talk with the C.O.'s. I was accompanied
by Lt. Muller.

# A P P E N D I X

## ( B )

## DEPARTMENT OF PRISONS
### Long-Range Population Projections

The population projections presented on the attached schedules are a product of a projection model that is simply based upon population development of the Department of Prisons over the last five years. During that period, the population increased at a rate of approximately 15% per year. The attached projections anticipate a similar increase over the next four years. The Department has used this projection model for the last thirteen months and, while the model is admittedly a very simple approach to a very complex problem, our projections have been very close. In July, 1981 our actual average population was only 2.5% less than projected.

The Department of Prisons will continue to update this projection model on a six month basis. At the same time, we will continue our attempts to develop a more reliable population projection model which can take in the various components which affect population growth.

Attachment 2 indicates that, if our population continues to grow at the present rate, we will be over design capacity of our institutions by 933 in June, 1985. In order to deal effectively with this situation, the 1981 Legislature appropriated to the Public Works Board sufficient funds to conduct a planning study for the Department. That study is now in progress. The study will attempt to answer the following questions: How many additional beds are required? When will they be required? What kinds of beds are needed or desired (type of programming)? Where should the beds be provided? How much will they cost?

The Public Works Board, working with the Division of Forestry and the Department of Prisons, will determine the feasibility of Honor Camp expansion. They will also explore expansion of the Restitution/Work Release Center program. The Board and the Department will determine the number and type of additional major institution beds required. When that is accomplished, the Board will determine the feasibility of expanding existing institutions. They will also determine if new major institutions are required.

The findings of the Public Works Board study will determine the expansion program to be recommended to the 1983 Legislature. The type of beds recommended to and approved by the Legislature will determine the speed with which the expansion can be accomplished. Expansion of Honor Camps and Restitution Centers can be accomplished quickly. Additions to existing institutions can be accomplished more quickly than construction of a new institution.

DEPARTMENT OF PRISONS
INSTITUTIONAL CAPACITIES vs PROJECTED POPULATIONS

| | SNCC | NWCC | NNCC | NSP | NNHC | LCHC | SDHC | NNRC | SNRC | SDCC | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **June 30, 1982** | | | | | | | | | | | | |
| Design Capacity: | | | | | | | | | | | | |
| Existing Facilities | 350 | 104 | 612 | 329 | 108 | 36 | -- | 30 | 30 | -- | 1,599 | |
| Planned Facilities | -- | -- | 28 | -- | -- | -- | -- | -- | -- | 612 | 640 | |
| Requested Facilities | -- | -- | -- | -- | -- | 12 | 108 | -- | -- | -- | 120 | |
| Total | 350 | 104 | 640 | 329 | 108 | 48 | 108 | 30 | 30 | 612 | 2,359 | |
| Projected Population | 350 | 110 | 630 | 330 | 100 | 36 | 74 | 25 | 25 | 600 | 2,280 | 15.1% over 6-30-81 |
| Population (Over) Under Capacity | -0- | (6) | 10 | (1) | 8 | 12 | 34 | 5 | 5 | 12 | 79 | 6-30-81 |
| | | | | | | | | | | | | |
| **June 30, 1983** | | | | | | | | | | | | |
| Design Capacity: | | | | | | | | | | | | |
| Existing Facilities | 350 | 104 | 612 | 329 | 108 | 36 | -- | 30 | 30 | -- | 1,599 | |
| Planned Facilities | -- | -- | 28 | -- | -- | -- | -- | -- | -- | 612 | 640 | |
| Requested Facilities | -- | -- | -- | 48 | -- | 12 | 108 | -- | -- | 102 | 270 | |
| Total | 350 | 104 | 640 | 377 | 108 | 48 | 108 | 30 | 30 | 714 | 2,509 | |
| Projected Population | 350 | 120 | 813 | 360 | 100 | 50 | 108 | 25 | 25 | 650 | 2,601 | 31.3% over 6-30-81 |
| Population (Over) Under Capacity | -0- | (16) | (173) | 17 | 8 | (2) | -- | 5 | 5 | 64 | (92) | 6-30-81 |

There will be some adjustment between NNCC and SDCC.
Imbalance reflected above was caused by Legislature's decision
to approve new 102 man unit at SDCC instead of NNCC.

Prepared By Office of Assistant Director
August 14, 1981

DEPARTMENT OF PRISONS
LONG-RANGE POPULATION PROJECTIONS

| | PROJECTED POPULATION | DESIGN CAPACITY(1) | PROJECTED POPULATION OVER DESIGN |
|---|---|---|---|
| July, 1983 | 2633 | 2509 | 124 |
| August | 2665 | 2509 | 156 |
| September | 2697 | 2509 | 188 |
| October | 2731 | 2509 | 222 |
| November | 2764 | 2509 | 255 |
| December | 2797 | 2509 | 288 |
| January, 1984 | 2831 | 2509 | 322 |
| February | 2865 | 2509 | 356 |
| March | 2899 | 2509 | 390 |
| April | 2933 | 2509 | 424 |
| May | 2968 | 2509 | 459 |
| June | 3003 | 2509 | 494 |
| July | 3038 | 2509 | 529 |
| August | 3073 | 2509 | 564 |
| September | 3109 | 2509 | 600 |
| October | 3145 | 2509 | 636 |
| November | 3181 | 2509 | 672 |
| December | 3217 | 2509 | 708 |
| January, 1985 | 3254 | 2509 | 745 |
| February | 3291 | 2509 | 782 |
| March | 3329 | 2509 | 820 |
| April | 3366 | 2509 | 857 |
| May | 3404 | 2509 | 895 |
| June, 1985 | 3442 | 2509 | 933 |

(1) Includes 1,599 beds existing, 640 under construction or bid, and 270 approved by the 1981 Legislature, for a total capacity of 2,509. All beds should be on-line before July, 1983.

Prepared by Office of Assistant Director
August 14, 1981

A P P E N D I X
--------------------

( C )

# MEMORANDUM

TO: John Slansky, Superintendent NNCC  DATE: 7/23/81

FROM: H. E. Harvey

SUBJECT: Hot & Cold Food Carts for Units 4 & 5

---

In testing the two hot food carts that we have been trying to find way's to modify for use in the units, Glen Baily has found that one side of the carts is refrigerated.

To use the two carts the following modifications would still be necessary.

Two metal walls will have to be added to the refrigerated side of the carts designed to hold 20 of our present yellow 10" trays, 10 to a side.

The hot side already have the tray glides installed to take trays that are 9½". We will have to purchase enough 9½" trays to use for the hot side of the carts. These trays will be about $2.00 each.

Glean Baily estimates that it will take about $75.00 to install the necessary power in each unit.

I do not have an estimate from Mike Walsh concerning the cost of putting in the tray glides.

If the carts are modified  the feeding procedure would be as follows:

Food will be panned up at the Culinary as we do at the present time and moved to the units. The food will then be put into the new hot tables that are on order at the present time where it will be held at the proper temperature until time to dish it up.

As soon as the food is put on the trays it will be put into the cart which will be pre-heated and pre-chilled and then moved down the hall and served out of the cart at each room.

This system should get hot & cold food to the inmates that are in areas where in the past we have had a problem with proper food service. Unfortunately, this system is not going to work unless there is some supervision by the unit officers and other staff in the units.

cc: Perry Comeaux          -32-

HOT & COLD FOOD CARTS
UNITS 4 + 5



APPROXIMATELY 34½"

10⅜"  10⅜"  9½"  9½"

COLD FOOD SIDE    HOT FOOD

THE HOT FOOD SIDE HOLDS 20 TRAYS, 10 PER SIDE.
THESE TRAY'S ARE 9½" WIDE

MODIFICATION NEEDED: COLD FOOD SIDE
ADD TRAY HOLDER GUIDES TO COLD SIDE TO
HOLD 20 TRAYS, 10 PER SIDE.
THESE GUIDES SHOULD BE SPACED TO HOLD
TRAYS THAT ARE 10" WIDE.

HOT FOOD SIDE DOES NOT HAVE TO BE
MODIFIED

# CERTIFICATE OF SERVICE
## BY MAIL
--------------------------------

Pursuant to FRCP 5(b) I certify that on this date
I deposited for mailing at Sacramento, California, a true
copy of the attached document to:

Mr. Ernest E. Adler                 Mr. Robert L. Stickney
Deputy Attorney General             Inmate Counsel Substitute
Capitol Complex                     Post Office Box 607
Carson City, Nevada 89710           Carson City, Nevada 89701


DATED:  9/13/81
------------------------------

------------------------------------------------
          JERRY   ENOMOTO